**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BRIAN RAY, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>MAPFRE U.S.A. CORP. and THE COMMERCE INSURANCE COMPANY,<br><br>        Defendants. | Case No. ___23-cv-12214___<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brian Ray ("Plaintiff") brings this Class Action Complaint, on behalf of himself and all others similarly situated, against Defendant MAPFRE U.S.A. Corp. (d/b/a MAPFRE Insurance) ("MAPFRE") and The Commerce Insurance Company ("Commerce") (and collectively with MAPFRE, "Defendants"), alleging as follows based upon information and belief, and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge.

## NATURE OF THE CASE

1.    Plaintiff brings this class action against Defendants for their: (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation, Driver's License numbers ("PII"); (ii) failure to comply with industry standards to protect information systems that contain PII; and (iii) unlawful disclosure of Plaintiff's and Class Members' PII.

2.    Plaintiff seeks, among other things, damages and orders requiring Defendants to fully and accurately disclose the PII and other information that has been compromised and/or

disclosed; to adopt reasonably sufficient security practices and safeguards to protect Plaintiff's and the Class's PII from unauthorized disclosures; and to prevent incidents like this disclosure from occurring again in the future. Plaintiff further seeks an order requiring Defendants to provide identity theft protective services to Plaintiff and Class Members for three years, as Plaintiff and Class Members are at risk and will continue to be at an increased risk of identity theft due to the disclosure of their PII as a result of Defendants' conduct described herein.

3.      MAPFRE is a Fortune 500 company that provides insurance, including automotive and property policies, to over 30 million customers worldwide.

4.      Defendants employ an online instant auto insurance quote process, enabling individuals to quickly obtain an insurance quote from Defendants.

5.      To obtain an insurance quote online, users are directed to an online form, which asks for basic information about the individual, including their name, age, and email address.

6.      When users fill in their basic information, MAPFRE will auto populate that form with the user's Driver's License number to provide users with their quote.

7.      Because of the system MAPFRE utilizes, criminal actors are able to use information they had obtained independent of MAPFRE to begin to fill in the form, which would then provide them with that person's Driver's License number.

8.      MAPFRE's system may have also allowed it to intentionally disclose other information regarding what vehicle an individual owns, such as make, model, year, and vehicle identification number ("VIN").

9.      By virtue of these cybercriminals' actions and the way MAPFRE configured and designed its systems, MAPFRE intentionally disclosed the Driver's License numbers of their customers, and even non-customers.

10.    On August 22, 2023, MAPFRE provided Plaintiff with a notice indicating that, between July 1 and July 2, 2023, an unidentified third-party illegally used some of Plaintiff's information, including his name and date of birth, to obtain auto insurance quotes from MAPFRE's website, www.mapfreinsurance.com. The auto insurance quote MAPFRE provided to the cybercriminals disclosed Plaintiff's Driver's License number, and possibly more information regarding the vehicle he owns, to the unauthorized third party(s).

11.    Defendants' policies and practices allowed unauthorized third parties to intentionally target and improperly obtain Plaintiff's and Class Members' PII through the use of MAPFRE's online insurance quote and/or policy process (the "Data Disclosure").

12.    Indeed, MAPFRE intentionally configured and designed its online system to auto-populate at least responses to requests for insurance quotes with certain PII obtained from third-party data providers, including Driver's License numbers, regardless of whether those requests are submitted by the individual to whom such information pertains and to disclose that PII to whomever submitted the request. If not for MAPFRE's intentional configuration and design of its systems, it would not have disclosed Plaintiff's and Class Members' PII to cybercriminals.

13.    The Data Disclosure was a direct and proximate result of MAPFRE's flawed online auto insurance quote system's configuration and design, which unnecessarily disclosed PII to anyone who submitted a request for an auto insurance quote, its failure to verify users, and its failure to implement and follow basic security procedures, such as validating the identity of insurance applicants before disclosing their highly sensitive PII.

14.    In the past three years, industry experts have specifically highlighted the importance of driver's license numbers and the ways in which a coordinated campaign by hackers and malicious attackers is dedicated to collecting those numbers to commit identity theft. In fact,

a driver's license is a critical part of a fraudulent, synthetic identity that can be sold on the dark web and is a jackpot for thieves that can be used to create fake driver's licenses or other fake IDs, open fraudulent accounts, avoid traffic tickets or collect government benefits such as unemployment checks, and use for verification on any government form that requires identity verification. Driver's license numbers are also exceptionally useful for fraudsters to craft curated phishing attacks and impersonate government officials to obtain even more information or insert malicious links or attachments into email.

15.     Drivers' license numbers have been taken from auto-insurance providers by hackers in multiple other attacks, including Geico, Farmers, USAA, Kemper, Metromile, Elephant, Cornerstone, and American Family—all since 2021—indicating this particular form of personal information is in high demand and that sophisticated insurance companies like Defendants knew or had reason to know their security practices were of particular importance to safeguard consumer data.

16.     To provide its products and services, Defendants acquired, stored, and utilized Plaintiff and Class Members' PII. By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. By voluntarily undertaking the collection of this sensitive PII, Defendants assumed a duty to use due care to protect that information.

17.     Because MAPFRE essentially left its (cyber) door wide open for unauthorized users to access and pilfer individuals' PII, Plaintiff's and Class Members' PII is now in the hands of cybercriminals.

18.     As a result, Plaintiff and Class Members face substantially increased risk of future identity theft, both currently and for the indefinite future. Plaintiff's and Class Members' PII, including their Driver's License numbers, that was compromised by cyber criminals in the Data Disclosure, is highly valuable because its readily useable to commit fraud and identity theft.

19.     Driver's License numbers can be used to file fraudulent unemployment claims, to open new accounts, take out loans in someone's name, or commit income tax refund fraud as several states require a Driver's License number for a tax return. The cybercriminals who obtained Plaintiff's and Class Members' PII can use this information to commit a host of other financial crimes, including identity theft, and can sell this information to other identity thieves who will do the same.

20.     Consequently, Plaintiff and Class Members have had to spend, and will continue to spend, significant time and money in the future to protect themselves due to Defendants' actions.

21.     Plaintiff, on behalf of herself and all others similarly situated, brings claims for negligence, negligence *per se*, violation of the Driver's Privacy Protection Act ("DPPA"), and declaratory judgment.

22.     Plaintiff seeks damages and injunctive relief requiring MAPFRE to adopt reasonably sufficient practices to safeguard the PII that remains in MAPFRE's custody in order to prevent incidents like the Data Disclosure from reoccurring in the future. Given that information relating to the Data Disclosure, including the systems that were impacted, the configuration and design of MAFPRE's website, and the method of accessing PII in MAFPRE's insurance quoting process remain exclusively in Defendants' control, Plaintiff anticipates additional support for his claims will be uncovered following a reasonable opportunity for discovery.

## PARTIES

23.     Plaintiff Brian Ray is a resident and citizen of the Commonwealth of Massachusetts. Plaintiff received a data disclosure notice from Defendants informing him that Defendants disclosed his PII without his authorization to unknown third parties.

24.     Since the announcement of the Data Disclosure, Plaintiff has been the victim of identity theft: he has experienced the fraudulent opening of several lines of credit in his name, which he found out by contacting one of the credit bureaus. Plaintiff has been required to spend his valuable time and resources monitoring his financial accounts, changing passwords, and contacting the credit bureaus about a credit freeze in an effort to detect and prevent misuses of his PII. Plaintiff would not have to undergo such time-consuming efforts but for the Data Disclosure.

25.     As a result of the Data Disclosure, Plaintiff has been and will continue to be at heightened risk for fraud and identity theft, and its attendant damages for years to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Disclosure.

26.     Defendant MAPFRE U.S.A Corp. is a Massachusetts corporation with its principal place of business is in Webster, Massachusetts.

27.     Defendant Commerce is a Massachusetts corporation with its principal place of business is in Webster, Massachusetts. Commerce is a corporate subsidiary of MAPFRE responsible for underwriting automobile insurance policies sold and offered by MAPFRE.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under the laws of the United States, including the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.*

29.     Alternatively, the Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because at least one member of the Class, as defined below, and Defendants are citizens of different states and the amount in controversy exceeds $5,000,000.

30.     The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are related to claims in the action within such original jurisdiction and they form part of the same case or controversy under Article III of the United States Constitution.

31.     This Court has personal jurisdiction over Defendants because (1) Defendants actively market their products and conduct substantial business in and throughout Massachusetts, where there are a considerable number of MAPFRE policyholders; (2) Defendants reside in the Commonwealth; and (3) the wrongful acts alleged in the Complaint, including MAPFRE's intentional disclosure of Plaintiff's Driver's License number caused harm to Plaintiff in Massachusetts.

32.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the acts, omissions, Defendants reside in this District, and the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

**A.     MAPFRE and its Instant Auto Insurance Quote Website**

33.      MAPFRE offers "a wide range of insurance solutions for the home and vehicle;" is the nineteenth largest private passenger auto insurance; and does business in twelve states.[1]

---

[1] *Who We Are*, MAPFRE, https://www.mapfreinsurance.com/who-we-are/ (last visited Sept. 19, 2023).

34.     Under the framework that MAPFRE's website utilized before and during the Data Disclosure, individuals seeking an insurance quote from MAPFRE are only required to provide minimal information. The remainder of the information needed to process the request is typically obtained from the relevant state's department of motor vehicles ("DMV") or other third parties, such as insurers or data aggregators, who receive this information from state DMVs.

35.     MAPFRE's website, and the framework at issue in this litigation, was created by Defendants and was entirely under Defendants' control.

36.     This framework is by design. MAPFRE, like other insurers, intentionally allows individuals requesting an auto insurance quote to provide only limited information. This makes the process faster and less burdensome on the consumer, increasing the likelihood that they submit the application and thus increasing the number of requests for quotes that MAPFRE receives. However, this "shortcut" process and intentional design feature on MAPFRE's system also makes it extremely ripe for exploitation and misuse by cybercriminals, such as what occurred to Plaintiff and Class Members during the Data Disclosure.

37.     Upon information and belief, if a user receives an auto insurance quote from MAPFRE, MAPFRE discloses the user's Driver's License number on the quote.

38.     However, this process of applying for an insurance quote is easily exploitable by cybercriminals to obtain the PII of other individuals, such as Plaintiff and Class Members.

39.     For example, cybercriminals who possess only minimal and basic information of Plaintiff and Class Members—such as a name, an address, and a date of birth, some of which may have been stolen or found elsewhere—can submit fraudulent requests for insurance quotes to extract more detailed and sensitive PII from MAPFRE's system, such as Driver's License numbers, which MAPFRE provides in response on the final insurance quote. By repeating this

process for multiple individuals, cybercriminals can develop a cache of highly sensitive personal information, including Driver's License numbers, that they can then use to commit fraud or identity theft or sell on the dark web to other bad actors.

40.    Plaintiff and Class members are entitled to security of their PII. As an insurance company collecting and storing sensitive information, and as a DMV contractor with access to sensitive data such as Driver's License numbers, MAPFRE has a duty to ensure that such private, sensitive information is not disclosed or disseminated to unauthorized third parties.

**B.    MAPFRE Was on Notice that a Data Disclosure Was Likely**

41.    Defendants were on notice that the intentional design of their instant auto insurance quote process would leave them vulnerable to a cyberattack, such as the Data Disclosure. Since the beginning of 2021, numerous insurance companies have suffered and/or reported data disclosures similar or identical to that suffered by Defendants:

- Metromile—disclosed the Driver's License numbers of approximately 120,000 individuals;

- Root Insurance Company—disclosed the Driver's License numbers, dates of birth, and vehicle information of approximately 73,000 individuals;

- Hagerty Insurance Agency—disclosed the Driver's License numbers, names, dates of birth, gender, address, and marital states of approximately 149,000 individuals.

- Farmers Insurance Exchange and 21st Century Insurance Company—Disclosed the information of approximately 54,000 individuals;

- American Mutual Insurance Company—disclosed the Driver's License numbers of approximately 283,000 individuals;

- Noblr Reciprocal Exchange—disclosed the names and Driver's License numbers of approximately 97,000 individuals;

- GEIGO—disclosed the Driver's License numbers of approximately 131,000 individuals;

- State Automobile Mutual Insurance Company—disclosed the names, Driver's License numbers, dates of birth, and gender of numerous individuals;

- Midvale Indemnity Company—disclosed the Driver's License numbers of numerous individuals;

- Alfa Insurance—disclosed the Social Security Numbers and Driver's License numbers of approximately 5,000 individuals;

- Infinity Insurance Company—disclosed the names, Driver's License numbers, addresses, and Social Security Numbers of numerous individuals.[2]

42.    Indeed, cyberattacks directed at insurance companies' instant online automobile insurance quote processes have been become so commonplace that state regulators such as the New York State Department of Financial Services, have warned insurance companies that not only have cybercriminals targeted websites that offer instant online automobile insurance premium quotes to steal unredacted Driver's License numbers, cybercriminals have offered to sell

---

[2] *Dissent*, *Despite an alert from NYS DFS, some insurance companies with "instant quote" portals were victimized*, DataBreaches.net (May 19, 2021).

techniques to access Driver's License numbers from auto insurance websites and step-by-step instruction on how to steal them.[3]

43.    Despite the prevalence for which cybercriminals target instant online automobile insurance quote websites to steal sensitive PII such as Driver's License numbers, Defendants failed to employ adequate data security measures to safeguard their own instant online automobile insurance quote website.

44.    Organizations with reasonable and adequate cybersecurity will employ data security processes to protect their instant online automobile insurance quote websites from a cyberattack or unauthorized disclosure, including:

- avoiding the display of prefilled PII on public-facing websites;

- installing web application firewalls to protect against malicious attacks and exploitation of vulnerabilities by inspecting incoming traffic for suspicious activity;

- blocking the IP addresses of suspected unauthorized users and consider a quote limit per user session;

- limiting access that users may have to adjust, deface, or manipulate website content using web developer tools on public-facing websites;

- confirming that redaction and obfuscation for PII is implemented properly throughout the entire transmission of the PII until it reaches the public-facing website;

---

[3] *Industry Letter*, Cybersecurity Division, Department of Financial Services (Feb. 16, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert

- implementing Completely Automated Public Turing Tests ("CAPTCHA") to attempt to detect and block bots;

- improving access controls for agent portals that allow access to consumer PII by requiring robust passwords and limited login attempts;

- training employees and agents to identify social engineering attacks;

- ensuring that employees and agents only have access to sensitive information that is necessary to do their jobs;

- waiting until an eCheck, credit card, or debit card payment has been cleared by the issuing bank before generating an online policy and granting the policyholder access to PII; and

- ensuring that APIs used to pull data files from data vendors are not directly accessible from the internet or agent portals.

45.     Upon information and belief, Defendants failed to implement one or more of these data security measures to protect their auto insurance quote website from a cyberattack such as the Data Disclosure.

**C.     The MAPFRE Data Disclosure**

46.     On August 22, 2023, MAPFRE notified Plaintiff that an "an unknown party used information about you – which was already in the unknown party's possession – to obtain access to additional information about you through MAPFRE's Massachusetts online quoting platform."[4]

47.     Defendants' notice further explains that an "unknown party obtained access through your driver's license number through MAPFRE's Massachusetts online quoting platform"

---

[4] *Data Security Incident Report of MAPFRE Insurance: Notice Submitted to Persons*, MAPFRE (Aug. 22, 2023), https://www.mass.gov/doc/assigned-data-breach-number-30358-the-commerce-insurance-company-mapfre-insurancer/download.

and that "[t]he unknown party may also have obtained access to information regarding vehicles

you own, including make, model, year, and vehicle identification number."[5]

48.     As these cybercriminals are in the possession of the PII compromised in the Data

Disclosure, Plaintiff and Class Members have been and remain at a certainly impending and

imminent risk of fraud and identity theft.

**D.    MAPFRE Obtains, Collects, and Stores Plaintiff's and Class Members' PII**

49.     In the ordinary course of doing business as an automobile insurer, MAPFRE

regularly requires its customers to provide their sensitive, personal, and private protected

information in order to register and use Defendants' services.

50.     Automobile insurers, such as MAPFRE, store and obtain additional personal

information that they receive from other sources. For instance, automobile insurers share claims

information among themselves to help weed out consumers who switch to other providers. These

insurers also have access to a consumer's Driver's License number, current auto policy data, and

make and model of a consumer's vehicle. Often, this information needed to process the request is

typically obtained from the relevant state DMVs or other third parties, such as insurers or data

aggregators, who receive this information from state DMVs.

51.     Automobile insurers, as in the case of MAPFRE, aim to make applying for an auto

insurance policy as easy as possible to attract new customers. To do so, automobile insurers like

MAPFRE require only a minimal amount of information to apply for a policy. The remainder of

the information is filled in from data acquired from other sources.

52.     Cybercriminals employ a variety of techniques for obtaining this PII, including

extracting data from the website's code, using web developer tools meant for debugging, and

---

[5] *Id.*

calling live agents with enough other information to persuade them to hand over other forms of personal information, such as Driver's License numbers. Indeed, the practice is so prominent there are "how-to guides" that aspiring criminals can buy that have appeared on cybercrime forums.

53.    But Defendants did not have to configure or design their auto insurance quote system in this way. For example, instead of auto populating insurance quote fields with highly sensitive PII, Defendants could have validated the user's information and processed the quote on the 'back-end' after receiving the applicant's information. Nor was there a need for Defendants to disclose highly sensitive PII, like a purported quote applicant's Driver's License number in response to a request for a quote.

54.    Defendants are in complete operation, control, and supervision of the MAPFRE website and systems, including the insurance quote portal. Defendants intentionally configured and designed their website and systems this way because it helped to increase the number of quotes requested, benefiting their business, without regard to Plaintiff's and Class Members' PII which was disclosed to cybercriminals in the process given this exploitability.

55.    By obtaining, using, disclosing, and deriving a benefit from Plaintiff's and Class Members' PII, MAPFRE assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

56.    Thus, MAPFRE had access to Plaintiff's and Class Members' PII, including their Driver's License numbers, which was stored on their systems, which it then intentionally disclosed to cybercriminals when generating a quote.

57.    Plaintiff and Class Members reasonably expect that insurance service providers such as Defendants will use the utmost care to keep their PII confidential and securely maintained,

to use this information for business purposes only, and to make only authorized disclosures of this information.

58.    MAPFRE acknowledges that it has an obligation to protect consumers' PII from disclosure. MAPFRE states in their Privacy Policy that they have "always made it a priority to protect your personal and privileged information;" that they "limit access to your personal and privileged information to those persons who need to know it to perform their jobs and to provide service to you;" that they "maintain physical and electronic safeguards to protect such information from unauthorized use or disclosure;" and that they will "not sell your information."[6]

59.    Though Plaintiff did not sign up for MAPFRE on his own, he was nonetheless an involuntary user of the system once cybercriminals used their information to fraudulently obtain insurance quotes. MAPFRE, by its own admission, therefore, owed Plaintiff the same duty to protect his PII as other, intentional, users.

60.    Despite Defendants' commitment to protecting personal information, MAPFRE failed to prioritize data and cybersecurity by adopting reasonable data and cybersecurity measures to prevent and detect the unauthorized access to Plaintiff's and Class Members' PII.

61.    Had MAPFRE remedied the security deficiencies, heeded advice from government regulators, followed industry guidelines, and adopted cybersecurity measures recommended by experts in the field, MAPFRE could have prevented intrusion into its information systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

---

[6]    *Privacy Policy*, MAPFRE, https://www.mapfreinsurance.com/privacy-policy/#:~:text=MAPFRE%20Insurance%20has%20always%20made,required%20or%20permitted%20by%20law. (last visited Sept. 19, 2023).

**E.    The Value of Private Information and Effects of Unauthorized Disclosure**

62.    MAPFRE was well aware that the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to those who would use it for wrongful purposes.

63.    MAPFRE also knew that a breach of its systems and exposure of the PII sorted therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

64.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7]

65.    As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[8]

66.    Driver's License numbers in particular—which were compromised as a result of the Data Disclosure—are highly sought after by cybercriminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

67.    Driver's license numbers are also very valuable to phishers, hackers, identity thieves, and cyber criminals, especially at this time where unprecedented numbers of criminals are filing fraudulent unemployment benefit claims and driver's license information is uniquely connected to financial fraud, as well as to the ability to file a fraudulent unemployment benefit claim.

---

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[8] https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

68.     Indeed, hackers often aggregate information taken from data disclosures on users to build profiles on individuals. These profiles combine publicly available information with information discovered in previous data breaches and exploited vulnerabilities. There are few data breaches that provide a comprehensive snapshot of any one individual person. Unique and persistent identifiers such as Social Security Numbers, driver's license numbers, usernames, and financial account numbers (e.g., credit cards, insurance policy numbers, etc.) are critical to easily forging an identity. When not all information is available, the stolen information is used to socially engineer a victim into providing additional information so a "fullz"[9] profile can be obtained.

69.     For example, a health care system and a retail store point-of-sale system may have two unrelated data breaches where an individual's information is taken. The individual's driver's license may not be in either of those databases, but after the Data Disclosure, a threat actor could have improved the profile and added a driver's license number. The value of that profile would allow such crimes as identity theft, financial crimes, and even illegal voting that would not previously have been possible.

70.     There is no legitimate or legal reason for anyone to use Defendant's inadequate website security to acquire driver's license information of Plaintiff and the Class. The only reason is for immediate or eventual malicious intent, since no one would go to the trouble of obtaining data that had no value. Any non-public data, especially government issued identification numbers like a driver's license or non-driver's identification number, has criminal value. On the darknet markets, a driver's license, combined with the full name and state issued, is a sought-after data point. Darknet markets are a downstream "flea market" for data to be sold, usually not by the

---

[9]     "Fullz" is slang used by threat actors and various criminals meaning "full information," a complete identity profile or set of information on any entity or individual.

original threat actor or criminal group. It is a dumping ground, usually after the data has been exploited. This is especially true here, where Defendant's Notice of Data Disclosure concedes that the information was given to unauthorized third parties by their Progressive agents and employees.

71.     The value of stolen driver's license information currently has a darknet market ("DNM") value of $1 per license. This was re-verified on March 3, 2022, accessing several DNMs using a trusted identity. Social Security Numbers, once considered the "gold standard" of identity fraud, are also selling for $1 per value in those same markets. This illustrates the value of driver's license information to cybercriminals and people committing identity fraud. According to popular darknet markets, cyber criminals value driver's licenses equally to Social Security Numbers.

72.     In some ways, driver's license numbers are even more attractive than Social Security Numbers to threat actors and more dangerous to the consumer when compromised. Unlike a Social Security Number, a driver's license number is not monitored as closely, so it can potentially be used in ways that will not immediately alert the victim. Threat actors know this as well. Because driver's licenses contain, or can be used to gain access to, uniquely qualifying and comprehensive identifying information such as eye color, height, weight, sex, home address, medical or visual restrictions, and living will/health care directives, most insurance and credit agencies highly recommend that immediate notice, replacement, and identity theft protections are put in place for a minimum of three years. Most cyber experts, including Enterprise Knowledge Partners, recommend five years or more.

73.     Stolen driver's licenses can be used (alone or in combination with other information) by malicious actors to accomplish the following:

- Apply for credit cards;

- Apply for financial loans (especially student loans);

- Open bank accounts;

- Obtain or create fake driver's licenses;

- Given to police for tickets;

- Provided to accident victims;

- Collect government unemployment benefits;

- Create and sell underage fake IDs;

- Replace/access account information on:

- LinkedIn,

- Facebook/Meta,

- WhatsApp,

- Instagram;

- Obtain a mobile phone;

- Dispute or prove a SIM swap;

- Redirect U.S. mail;

- Apply for unemployment benefits;

- Undocumented individuals may use them as a method to gain access to the U.S., and claim a lost or stolen passport;

- Create a fake license as a baseline to obtain a Commercial Driver's License;

- File tax returns or gain access to filed tax returns; and

- Engage in phishing and other social engineering scams.

74.     Unsecured sites that contain or transmit PI, such as a driver's license, require notice to consumers when the data is stolen because it can be used to perform identity theft and other types of fraud. A threat actor is usually motivated by financial or political gain before it exerts

time, and skill to compromise and exfiltrate. Over time, identity thieves have systematized their criminal activities to gather important pieces of a synthetic identity from multiple breaches and sources. The theft of a driver's license number is no less valuable in that endeavor than the theft of a Social Security Number, as demonstrated by these two unique identifiers carrying the same price on the darknet, and by the fact that the identity thieves have demonstrated a systematic and businesslike process for collecting these stolen driver's license numbers in this Unauthorized Data Disclosure and others committed against insurers.

75.    The frequency of cyberattacks has increased significantly in recent years.[10] As noted in recent reports by Deloitte and Interpol, cyberattacks have greatly increased in the wake of the COVID-19 pandemic.[11]

76.    As alleged above, stolen PII is often trafficked on the "darknet" or "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

77.    When malicious actors infiltrate companies and exfiltrate the PII that those companies store or have access to, that stolen information often ends up on the dark web because

---

[10]    *Top Cyberattacks of 2020 and How to Build Cyberresiliency*, ISAC (Updated Feb. 3, 2021), https://www.isaca.org/resources/news-and-trends/industry-news/2020/top-cyberattacks-of-2020-and-how-to-build-cyberresiliency (last accessed Sept. 14, 2022) (citing Cybersecurity Ventures, https://cybersecurityventures.com/hackerpocalypse-cybercrime-report-2016).

[11]    Cedric Nabe, *Impact of COVID-19 on Cybersecurity*, Deloitte, https://www2.deloitte.com/ch/en/pages/risk/articles/impact-covid-cybersecurity.html (last accessed Sept. 14, 2022); Interpol, *Cyberthreats are constantly evolving in order to take advantage of online behaviour and trends. The COVID-19 outbreak is no exception*, https://www.interpol.int/en/Crimes/Cybercrime/COVID-19-cyberthreats (last accessed Sept. 14, 2022).

the malicious actors buy and sell that information for profit.[12] "Why else would hackers . . . steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).

78.    Consumers' PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[13] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[14] Alternatively, criminals are able to purchase access to entire company data breaches for $900 to $4,500.[15] (Note: the prices can vary depending on the point in the chain – verified identities may sell for higher prices early in the chain, then for the lower prices described above when they reach the "flea market sites.")

79.    The information compromised in the Data Disclosure is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. And the information compromised in the Data Disclosure can be used to *open* fraudulent bank accounts and credit and debit cards, as well as benefits accounts in various state benefits offices, compounding the identity theft and cycle

---

[12]    *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce (Feb. 2, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last accessed Sept. 14, 2022).

[13]    Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Sept. 14, 2022).

[14]    Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Sept. 14, 2022).

[15]    *In the Dark*, VPNOverview, 2019, *available at* https://tinyurl.com/mr3nsc24 (last accessed Sept. 14, 2022).

of black market sales detailed above. The driver's license numbers compromised in this Data Disclosure are also more valuable because driver's license numbers are long lasting, and difficult and problematic to change. Here, where motor vehicle records information is combined with additional verified customer information such as names, addresses, and Social Security Numbers, the information is especially valuable to hackers and cybercriminals.

80.    Recently, Forbes writer Lee Mathews reported on Geico's unauthorized data disclosure that included driver's license numbers:

81.    Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200.[16]

82.    National credit reporting company, Experian, blogger Gayle Sato also emphasized the value of driver's license information to thieves and cautioned:

83.    Your driver's license may not seem like a jackpot for thieves, but it can be used to create fake driver's licenses, open accounts in your name, avoid traffic tickets or collect government benefits such as unemployment checks. Worse, if your license data has been stolen in a data breach, you may not even know it's being misused.[17]

84.    In fact, according to CPO Magazine, which specializes in news, insights, and resources for data protection, privacy, and cyber security professionals,

---

[16]    Lee Mathews, *Hackers Stole Customers' License Numbers from Geico in Months-Long Breach*, Forbes (April 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3066c2218658    (last accessed Sept. 14, 2022).

[17]    Gayle Sato, *What Should I Do If My Driver's License Number Is Stolen?* (Nov. 3, 2021), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last accessed Sept. 14, 2022).

85.     To those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation. Tim Sadler, CEO of email security firm Tessian, points out why this is not the case and why these numbers are very much sought after by cyber criminals: " . . . It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks. . . . bad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as unemployment numbers continue to soar. . . . In other cases, a scam using these driver's license numbers could look like an email that impersonates the DMV, requesting the person verify their driver's license number, car registration or insurance information, and then inserting a malicious link or attachment into the email.[18]

86.     Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique Driver's License numbers—cannot be easily replaced.

87.     The ramifications of Defendants' failure to keep Plaintiff and Class Members' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches, "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have

---

[18]     Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO Magazine (April 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed Sept. 14, 2022).

been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[19]

88.     Thus, MAPFRE knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were compromised. MAPFRE failed, however, to take adequate cyber security measures to prevent the Data Disclosure from occurring.

## F.    FTC Guidelines and the DPPA

89.     MAPFRE is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

90.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[20]

91.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no

---

[19] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Sept. 19, 2023).
[20] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Sept. 15, 2023).

longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[21]

92.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[22]

93.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

94.     Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. MAPFRE's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive Driver's License information provided in its response to requests for insurance quotes, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

95.     Defendants were at all times fully aware of their obligations to protect the PII of consumers because of their business of obtaining, collecting, and disclosing PII as well as

---

[21]  *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 15, 2023).
[22] *Id.*

collecting, storing, and using other confidential personal and financial information. MAPFRE was also aware of the significant repercussions that would result from its failure to do so.

96.    The DPPA was enacted in 1994 in response to safety and privacy concerns stemming from the ready availability of personal information contained in state motor vehicle records. The DPPA was passed in the backdrop of the murder of actress Rebecca Schaeffer, whose murderer obtained her unlisted address through the California DMV. Additional concerns were raised when witnesses testified in hearings before Congress regarding the privacy of Department of Motor Vehicle information of domestic violence victims and law enforcement officers, among other safety concerns surrounding driver information. To address these concerns, the DPPA restricts the disclosure of personal information from motor vehicle records to certain permissible purposes expressly defined by the act.

97.    The unauthorized disclosures of information have long been seen as injurious. The common law alone will sometimes protect a person's right to prevent the dissemination of private information. Indeed, it has been said that the privacy torts have become well-ensconced in the fabric of American law. And with privacy torts, improper dissemination of information can itself constitute a cognizable injury. Because damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable, such causes of action such as the DPPA provide privacy tort victims with a monetary award calculated without proving actual damages.

98.    The DPPA states that "[a] State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual

obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section." 18 U.S.C. § 2721(a)(1).

99.    Defendants had an obligation to use reasonable security measures under the DPPA, which further states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

100.    Thus, the DPPA provides citizens with a private right of action in the event that their private information is knowingly obtained, disclosed, or used in a manner other than for the enumerated permissible purposes. The DPPA states, "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C. §§ 2721 *et seq.*] shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724(a).

101.    The default rule under the DPPA is non-disclosure. The DPPA is structured such that 18 U.S.C. § 2721(a)(1) and 18 U.S.C. § 2722(a) provide the general prohibition on the release and use of motor vehicle information, and § 2721(b) enumerates fourteen specific exceptions to the general prohibition. Disclosing information to cyber criminals is not one of them. Because the PII was disclosed to unauthorized individuals—i.e., cybercriminals—there is no argument to be made that disclosure was "for a permissible purpose."

## G.    Plaintiff and Class Members Suffered Damages

102.    For the reasons mentioned above, Defendants' conduct, which allowed the Data Disclosure to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including a substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor credit and

financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

103.    The ramifications of MAPFRE's failure to keep PII secure are long lasting and severe. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Disclosure.

104.    As a result of Defendants' failures, Plaintiff and Class Members now face a substantial and imminent risk of identity theft and fraud as a result of the Data Disclosure. Unauthorized individuals carried out the Data Disclosure and stole the personal information of Plaintiff and Class Members with the intent to use it for fraudulent purposes and/or sell it to other cybercriminals.

105.    The risk of identity theft is particularly substantial when the PII compromised, in this instance Driver's License numbers, is unique to a specific individual and extremely sensitive.

106.    Plaintiff and Class Members have already spent and will spend substantial amounts of time monitoring their accounts for identity theft and fraud and reviewing their financial affairs more closely than they otherwise would have done but for the Data Disclosure. These efforts are burdensome and time-consuming.

107.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and the Class are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

108.    Further, many Class Members will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Disclosure.

109.    Despite all of the publicly available knowledge of the continued compromises of PII and the importance of securing such information, MAPFRE's commitment to privacy fell by the wayside. Rather than protect Plaintiff's and Class Members' PII, MAPFRE ignored these risks and knowingly configured and designed its systems in a way that disclosed this information to cyber criminals.

110.    As an auto insurance company that handles personal information containing Driver's License numbers as part of its business model, MAPFRE was well aware of the requirements and purpose of the DPPA.

111.    As an entity that receives information obtained from state DMVs, MAPFRE was well-informed that the PII it collected was highly sensitive personal data, and that disclosure of that information to the public by, for example, storing it on systems accessible to the whole internet, would violate the DPPA.

112.    Critically, only Defendants had control over the configuration and design of their own systems, and knowingly chose to forego necessary data protection, to secure Plaintiff's and Class Members' PII.

113.    Despite the clear dangers that the insecure use of PII poses, Defendants knowingly chose to configure and design their systems to disclose Plaintiff's and Class Members' PII to unauthorized third parties.

114.    As a result of MAPFRE's failure to prevent the Data Disclosure, Plaintiff and Class Members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Disclosure; theft of their valuable PII; the actual, imminent, and certainly impeding injury flowing from fraud and identity theft posed by their PII being placed in the hands of cyber criminals; damages to and diminution in value of their PII; and continued risk to Plaintiff's and the Class Members' PII, which remains in the possession of Defendants and which is subject to further disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII that was entrusted to them.

## CLASS ALLEGATIONS

115.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following nationwide class:

> All individuals in the United States whose PII was disclosed during the Data Disclosure by MAPFRE to unauthorized third parties.

116.    Excluded from the Class are Defendants, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

117.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

118.    **Numerosity.** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendants' records, including but not limited to the files implicated in the Data Disclosure, but based on public information, the Class includes approximately 200,000 individuals.

119.    **Commonality.** The requirements of Rule 23(a)(2) are satisfied. There is a well-defined community of interest and there are common questions of fact and law affecting Class Members. The questions of fact and law common to the Class predominate over questions which may affect individual members and include the following:

a.    Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

b.    Whether Defendants were negligent in collecting and disclosing Plaintiff's and Class Members' PII;

c.    Whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

d.    Whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

e.    Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

f.    Whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII by disclosing that information on insurance quotes in the manner alleged herein, including failing to comply with industry standards;

     g.      Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Disclosure;

     h.      Whether Defendants had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

     i.      Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

     j.      Whether Defendants violated 18 U.S.C. § 2721, *et seq.*, by disclosing Plaintiff's and Class Members' PII;

     k.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

     l.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Disclosure.

120.    **Typicality.** The requirements of Rule 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of Class Members. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendants to safeguard PII. Plaintiff and Class Members each had their PII disclosed by MAPFRE to an unauthorized third party.

121.    **Adequacy.** The requirements of Rule 23(a)(4) are satisfied. Plaintiff is an adequate representatives of the Class because his interests do not conflict with the interests of the Class Members. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of Class Members and have no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation.

122.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. The claims of Plaintiff and Class Members are substantially identical as explained above. While the aggregate damages that may be awarded to the Class Members are likely to be substantial, the damages suffered by the individual Class Members are relatively small. As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Certifying the case as a class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class.

123.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendants breached their duty to Plaintiff and Class Members, then Plaintiffs and each Class Member suffered damages by that conduct.

124.    **Injunctive Relief.** Defendants' uniform conduct is generally applicable to the Class as a whole, making relief appropriate with respect to each Class member.

125.    **Ascertainability.** Class Members are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendants' books and records.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(Plaintiff on behalf of the Class)**

126.    Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

127.    MAPFRE owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

128.    More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' systems, including their website, to ensure that Plaintiff's and Class Members' PII in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security system in a timely manner; (c) timely acting upon warning and alerts, including those generated by their own security systems, regarding intrusions to their networks; (d) maintaining data security measures consistent with industry standards; and (e) ensuring that their systems did not disclose Plaintiff's or Class Members' PII to unauthorized third-parties other than themselves who fraudulently submitted requests for insurance quotes.

129.    Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

130.    Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting and disclosing valuable

PII that is routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

131.   Defendants admit that they have a duty to protect consumer data. *See* ¶ 58, *supra*.

132.   Defendants had a duty not to engage in conduct that creates a foreseeable risk of harm to Plaintiff and Class Members.

133.   Further, Defendants' duty arose from various statutes requiring Defendants to implement reasonable data security measures to protect and not disclose PII, including but not limited to Section 5 of the FTC Act and the DPPA,.

134.   Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. Specifically, Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the breach while it was ongoing; and (c) maintain security systems consistent with industry standards.

135.   But for Defendants wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their PII would not have been compromised.

136.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

a.     Theft of their PII;

b.     Diminution in value of their PII;

c.     Costs associated with requested credit freezes;

d.     Costs associated with the detection and prevention of identity theft;

e.     Costs associated with purchasing credit monitoring and identity theft protection services;

f. Lowered credit scores resulting from credit inquiries following fraudulent activities;

g. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Disclosure;

h. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

i. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendants with the societal understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

j. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendants possession and is subject to further disclosures so long as Defendants' fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

137. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II
**VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT ("DPPA"),**
**18 U.S.C. § 2721, *et seq.***
**(Plaintiff on behalf of the Class)**

138. Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

139.    Pursuant to 18 U.S.C. § 2722(a), "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."

140.    Pursuant to 18 U.S.C. § 2721(a)(1), "[a] State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section."

141.    The DPPA also restricts the resale and redisclosure of personal information, and requires authorized recipients to maintain records of each individual and the permitted purpose of the disclosure for a period of five years. 18 U.S.C. § 2721(c).

142.    The DPPA provides a civil cause of action against "a person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted" under the statute. 18 U.S.C. 2724(a).

143.    "Person" is defined as "an individual, organization or entity." 18 U.S.C. § 2725(2). Defendants are "persons" under the DPPA.

144.    "Personal information" is defined as "information that identifies an individual, including an individual's . . . driver identification number. . ." 18 U.S.C. § 2725(3). Plaintiff's and Class Members' PII, which includes Driver's License numbers, is "personal information" under the DPPA.

145.    "Motor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a

department of motor vehicles." 18 U.S.C. § 2725(1). Defendants obtain motor vehicle records containing Plaintiff's and Class Members' PII, including their Driver's License numbers.

146.    Defendants obtain, use, disclose, resell, and redisclose motor vehicle records as part of their online insurance quote and/or policy process.

147.    Defendants' disclosure of Plaintiff's and Class Members' personal information to unauthorized individuals violated 18 U.S.C. §§ 2722(a) and/or 2721(a)(1).

148.    Defendants' disclosure of personal information was not a permitted use under 18 U.S.C. § 2721(b).

149.    Defendants knowingly obtained and/or disclosed Plaintiff's and Class Member's personal information, which came from a motor vehicle record, for a purpose not permitted under the DPPA.

150.    Defendants knowingly and voluntarily configured and designed their insurance quote application portal on its website to disclose Plaintiff's and Class Members' PII to anyone who requested an insurance quote in direct violation of the DPPA.

151.    Defendants installed no protections or security measures to protect this exposed information and willfully disclosed it to cyber criminals through the intentional configuration and design of its insurance quote application portal.

152.    Defendants failed to use reasonable care in protecting Plaintiff's and Class Members' PII by installing and maintaining substandard security measures that failed to protect it, and voluntarily disclosed it to cyber criminals through the intentional configuration and design of their computer systems and their insurance quote application portal.

153.    Alternatively, Defendants had constructive notice that they had disclosed the PII of Plaintiff and Class Members to unauthorized third parties, because they should have been aware

that configuring and designing their website to disclose Plaintiff's and Class Members' PII to anyone who submitted a request for a quote without authentication or other security protections would cause the disclosure of this information.

154.    Further, Defendants were on notice that cyber criminals were exploiting cybersecurity flaws on websites who offer instant online automobile insurance premium quotes by stealing nonpublic information, including Driver's License numbers.

155.    At the very least, Defendants were willfully ignorant that their website and servers were configured and designed without any protections to store Plaintiff's and Class Members' PII and would disclose that personal information to cyber criminals.

156.    Merriam-Webster's dictionary defines "disclose" as "to make known or public," "to expose to view," or, alternatively, "to open up." None of these definitions requires an identified intended recipient. Instead, disclosure is the act of exposure. Whether or not Defendants meant for identifiable third parties to access the information is not relevant. All that is required for a knowing disclosure is a voluntary action.

157.    Pursuant to 18 U.S.C. § 2724(b)(1)-(4), Plaintiff seeks, on behalf of themselves and members of the Class (1) actual damages, not less than statutory liquidated damages in the amount of $2,500; (2) punitive damages; (3) reasonable attorneys' fees and costs; and (4) preliminary and equitable relief as the Court determines to be appropriate.

**COUNT III**
**DECLARATORY JUDGMENT**
**(Plaintiff on behalf of the Class)**

158.    Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

159.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

160.    An actual controversy has arisen in the wake of the Data Disclosure regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

161.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure consumers' PII under the common law, and Section 5 of the FTC Act and the DPPA; and

b.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

162.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

163.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data disclosure from MAPFRE. The risk of another such breach is real, immediate, and substantial. If another breach at MAPFRE occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

164.     The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

165.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data disclosure from MAPFRE, thus eliminating the additional injuries that would result to Plaintiff and Class members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of themselves and all others similarly situated, pray for relief as follows:

a.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.      For damages in an amount to be determined by the trier of fact;

d.      For an order of restitution and all other forms of equitable monetary relief;

e.      Declaratory and injunctive relief as described herein;

f.      Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

g.      Awarding pre- and post-judgment interest on any amounts awarded; and

h.      Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Dated: September 27, 2023

_s/ Stephen J. Teti_____
Stephen J. Teti (BBO # 569332)
Karen Hanson Riebel (admission *pro hac vice* forthcoming)
Kate M. Baxter-Kauf (admission *pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401-2159
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: sjteti@locklaw.com
        khriebel@locklaw.com
        kmbaxter-kauf@locklaw.com